**UNITED STATES DISTRICT COURT**
**EASTERN DISTRICT OF NEW YORK**

| | |
|---|---|
| **SECURITIES AND EXCHANGE COMMISSION,**<br><br>                              **Plaintiff,**<br>      **v.**<br><br>**FRANCIS BILLER, RAYMOND DOVE, CHESTER ALVAREZ, TROY GRAN-BROOKS AND JUSTIN PLAIZIER,**<br><br>                      **Defendants, and**<br><br>**LIA PATRICIA SEPULVEDA SALAZAR, EDWARD LOPEZ GIRALDO, EDWARD CLARKE AND SHREDDERZ INTERNATIONAL CORP.,**<br><br>                      **Relief Defendants.** | **Civil Action No. 22-CV-____**<br><br>**JURY TRIAL DEMANDED** |

## COMPLAINT

Plaintiff, Securities and Exchange Commission (the "Commission"), alleges the following against defendants Francis Biller ("Biller"), Raymond Dove ("Dove"), Chester Alvarez ("Alvarez"), Troy Gran-Brooks ("Gran-Brooks"), and Justin Plaizier ("Plaizier" and collectively, the "Defendants") and relief defendants Lia Patricia Sepulveda Salazar, Edward Lopez Giraldo, Edward Clarke, and Shredderz International Corp. (collectively, the "Relief Defendants"):

## SUMMARY

1.      This is a securities fraud enforcement action.  From at least January 2016 through at least July 2018 ("the "Relevant Period"), the Defendants schemed to operate a call center in Medellin, Colombia through which they used high pressure sales tactics fraudulently to sell the stocks of numerous small United States-based public companies to United States investors.  Such

call centers are colloquially known as "boiler rooms."  Defendants' sales tactics included making false or misleading statements about their own roles in promoting the stock they were touting, and about the companies whose stock they were touting.  Companies that issue stock to the public are often called "issuers."

2.      Defendants were hired by groups of people who controlled the stock of the issuers whose stock they were touting.  These groups of people (called "control groups") owned a significant percentage of the issuers' stock that had been deposited with a broker-dealer and was thus available to be traded in the public markets (called "the float").  Defendants explicitly catered to control groups that controlled the float of the issuers, so that both the defendants and their clients would profit to the greatest extent from the boiler room's efforts.  The control groups unlawfully concealed their control of the float, by breaking up their stock into small blocks owned by foreign nominee companies they directed, and failing to file disclosures that would have revealed that all of those smaller blocks were under their common control.  The control groups wanted to sell the stock they owned in order to make a significant profit.  The control groups used Defendants' boiler room both to create demand from investors so they would have buyers for their shares, and to increase the price of the stock, thereby increasing their profits.

3.      During the Relevant Period, Defendants' boiler room promoted the stock of at least 18 issuers, in coordination with control groups who were dumping their shares of those issuers.  The demand created by Defendants' misleading promotions enabled control groups to sell millions of shares of stock, which generated over $58 million in trading proceeds for the control groups.  The stock of many of these issuers was thinly traded in the market when it was not being touted in one of the Defendants' promotional campaigns, so investors who purchased

these shares at Defendants' urging often had difficulty finding buyers when trying to sell their shares once Defendants' promotions were over.

4.     Defendants' fraudulent scheme involved promoting the stock of Oroplata Resources, Inc. ("Oroplata"), Garmatex Holdings Ltd. ("Garmatex") and PureSnax International, Inc. ("PureSnax"), in addition to many other issuers' securities.  To promote these issuers' shares, Defendants pretended to be affiliated with various non-existent financial advisory firms. Defendants made up legitimate-sounding names for these phony financial advisory firms and also created legitimate-looking websites for them.  When making telephone calls, Defendants routinely used spoofed phone numbers to show area codes that made it appear as if they were calling from the United States rather than Colombia.  When calling and emailing unsuspecting investors, Defendants also used false names, made false or misleading statements about the prospects of the companies whose stock they were touting, and failed to disclose that they were acting in coordination with control groups that were dumping their securities into the market.

5.     Defendants aggressively touted Oroplata, Garmatex, PureSnax, and other issuers' stock to prospective investors, including elderly retail investors, using high-pressure sales tactics during telephone calls.  Defendants made misleading statements about the issuers' prospects as investments and about the Defendants' own claimed stock-picking successes.  In actuality, Defendants called investors to persuade them to purchase these stocks so the Defendants' control group clients could sell their holdings of these stocks for a profit and so the Defendants could collect a share (often more than half) of the sales proceeds.  Defendants also sent email and text messages that attempted to convince the investors to hold the stocks even when their prices were declining.  Then, after selling several issuers' stocks, Defendants routinely shut down whatever

financial advisory firm name they had been using, and started over with new names, phone numbers, and websites, touting a new group of issuers' stocks to a different group of investors.

6.      Defendant Alvarez, in addition to calling potential investors to tout the stocks being promoted by Defendants' boiler room, frequently engaged in manipulative trading in issuers' securities near the start of each promotional campaign.  As detailed below in relation to his trading in Garmatex, Aureus, Inc. ("Aureus"), and Proto Script Pharmaceutical Corp. ("Proto"), Alvarez would often place a series of small buy orders to give the appearance of trading activity and to drive up quoted sales prices of an issuer's shares both before the Defendants' boiler room began promoting those shares or early in that promotional activity.

7.      For their efforts in promoting sales of their control group clients' stock, the Defendants were paid from the trading proceeds generated by the control groups' sales.  They typically charged their control group clients up to 65% of the trading proceeds attributed to the boiler room's sales efforts.

8.      The Defendants' victims, including elderly retail investors who invested their retirement savings based on the Defendants' material misrepresentations and omissions, were left holding nearly worthless investments while the Defendants and their clients profited by dumping their shares.

## **VIOLATIONS**

9.      As a result of the conduct alleged herein, Defendants violated, and unless restrained and enjoined will continue to violate, Section 17(a) of the Securities Act of 1933 ("Securities Act"), and Section 10(b) of the Securities Exchange Act of 1934 ("Exchange Act") and Rule 10b-5 thereunder, and Alvarez also violated, and unless restrained and enjoined will continue to violate, Section 9(a)(2) of the Exchange Act.

## NATURE OF THE PROCEEDINGS AND RELIEF SOUGHT

10.     The Commission seeks a permanent injunction against the Defendants, enjoining

them from engaging in the transactions, acts, practices, and courses of business alleged in this

Complaint, disgorgement of all ill-gotten gains from the unlawful conduct set forth in this

Complaint together with prejudgment interest pursuant to Section 21(d)(7) of the Exchange Act

[15 U.S.C. §78u(d)(7)], civil penalties pursuant to Section 20(d) of the Securities Act [15 U.S.C.

§77t(d)] and Section 21(d)(3) of the Exchange Act [15 U.S.C. §78u(d)(3)], orders barring the

Defendants from participating in any offering of a penny stock, pursuant to Section 20(g) of the

Securities Act [15 U.S.C. §77t(g)] and/or 21(d) of the Exchange Act [15 U.S.C. §78u(d)] and

such other relief as the Court may deem appropriate.

## JURISDICTION AND VENUE

11.     This Court has jurisdiction over this action pursuant to Section 22(a) of the

Securities Act [15 U.S.C. §77v(a)] and Sections 21(d), 21(e), and 27 of the Exchange Act

[15 U.S.C. §§78u(d), 78u(e), and 78aa].

12.     Venue lies in this District pursuant to Section 22(a) of the Securities Act

[15 U.S.C. §77v(a)] and Section 27 of the Exchange Act [15 U.S.C. §78aa].  Certain of the acts,

practices, transactions and courses of business alleged in this Complaint occurred within the

Eastern District of New York, and were accomplished, directly or indirectly, by making use of

means or instrumentalities of transportation or communication in interstate commerce, or the

mails.  For example, during the Relevant Period, Defendants called individuals who reside in the

Eastern District of New York, and individuals who reside in the Eastern District of New York

purchased the stock of Oroplata, Garmatex, and PureSnax during the Relevant Period.

## DEFENDANTS

13.     Francis Jason Dean Biller ("Biller"), age 52, is a Canadian citizen and a resident

of Medellin, Colombia.  On February 16, 2000, the British Columbia Securities Commission barred Biller from participation in the securities industry for a period of 10 years, including participating in any investor relations activities, and he was ordered to pay administrative penalties of $300,000.  In a separate criminal case filed in the British Columbia Supreme Court, Biller pled guilty in April 2005 to four counts of theft and fraud relating to his sales of investments and in September 2005, was sentenced to 3 years in prison.  On October 12, 2005, the Ontario Securities Commission, among other remedies, permanently barred Biller from trading in securities (with several exceptions for personal accounts) and permanently barred him from serving as a director or officer of a company registered with the Ontario Securities Commission.

14.     Raymond Christopher Dove, ("Dove"), age 43, is a Canadian citizen and a resident of Japan.

15.     Chester Bruce Alvarez ("Alvarez"), age 37, is a United States citizen and a resident of Medellin, Colombia, and of Oakland Park, Florida.

16.     Troy Gran-Brooks ("Gran-Brooks"), age 31, is a Canadian citizen and a resident of either Medellin, Colombia, or Canada.

17.     Justin Plaizier ("Plaizier"), age unknown, is a Dutch citizen and a resident of either Medellin, Colombia, or Canada.

## RELIEF DEFENDANTS

18.     Lia Patricia Sepulveda Salazar ("Salazar" aka Patricia Biller), age 49, is the wife of Biller and is a Colombian citizen residing in Medellin, Colombia.  Salazar, or accounts under her control or for her benefit, received at least $3 million that was proceeds of Defendants' illegal conduct.

19.     Edward Lopez Giraldo ("Giraldo"), age 43, is a family member of Salazar and is a

Colombian citizen residing in Medellin, Colombia.  Defendants, directly or indirectly, transferred at least $2 million to Giraldo, or accounts under his control or for his benefit, that were proceeds of Defendants' illegal conduct.

20.     Edward Thomas Clarke ("Clarke"), age 75, is a family member of Biller and/or Salazar and is a Canadian citizen residing in British Columbia, Canada.  Defendants, directly or indirectly, transferred at least $630,000 to Clarke, or accounts under his control or for his benefit, that were proceeds of Defendants' illegal conduct.

21.     Shredderz International Corp. ("Shredderz") was incorporated by Dove in June 2016 in the Federation of Saint Kitts and Nevis.  Dove is its sole officer and director. Defendants, directly or indirectly, transferred the net amount of at least $1,645,000 to Shredderz, or accounts under its control or for its benefit, that were proceeds of Defendants' illegal conduct.

**RELATED PARTIES**

22.     During the Relevant Period, Oroplata described itself as a company involved in lithium resource exploration and development.  Oroplata's stock (Ticker: ORRP) was quoted on OTC Link (previously, "Pink Sheets"), operated by OTC Markets Group, Inc.  Oroplata was incorporated in Nevada in 2011 and during the Relevant Period, was based in the Dominican Republic.

23.     Garmatex, formerly known as Oaxaca Resources Corp., described itself as a company that developed and supplied engineered fabric technology.   During portions of the Relevant Period, Garmatex's stock (Ticker: GRMX) was quoted on OTC Link.  Garmatex was incorporated in Nevada in 2014.

24.     During the Relevant Period, PureSnax described its business as focused on developing and selling healthy snacks to consumers.  PureSnax's stock (Ticker: PSNX) was quoted on OTC Link during the Relevant Period.  PureSnax was a New Jersey corporation that

was incorporated in 2011 and during the Relevant Period was headquartered in Woodbridge, New Jersey.

## BACKGROUND

25.    "Penny Stock," as used herein, generally refers to a security issued by a small company that trades at less than $5 per share.

26.    An "issuer" is a company whose securities are publicly traded.  An "affiliate" of an issuer is a person or entity that, directly or indirectly through one or more intermediaries, controls, is controlled by, or is under common control with, such issuer (i.e., a control person). "Control" means the power to direct management and policies of the company in question. Typically, affiliates include officers, directors and controlling shareholders, but any person who is under "common control" with, or has common control of, an issuer is also an affiliate.  As used herein, the term "control group" means a group that collectively is an "affiliate" of an issuer.

27.    The control groups who hired Defendants' boiler room were "affiliates" of the issuers whose stock they hired Defendants to promote in part because the control groups typically controlled those issuers' float.  Stock held by an affiliate of an issuer is restricted stock. Absent an exemption under the federal securities laws and rules, restricted stock cannot be legally offered or sold to the public unless a securities registration statement has been filed with the Commission (for an offer) or is in effect (for a sale).  A registration statement contains important information about an issuer's business operations, financial condition, results of operation, risk factors, and management.  It also discloses any person or group who is the beneficial owner of more than 5% of the company's securities.  The control groups did not file registration statements for the sales of stock that they hired the Defendants to promote.

28.    Instead of making public disclosures about their control over the issuers' float,

Defendants' control group clients took a number of steps to conceal their ownership of the float. First, the control groups divided the issuers' stock into blocks of under 5% each (a threshold for reporting ownership in registration statements, which is also used by many broker-dealers when evaluating deposits of stock into brokerage accounts). Second, they orchestrated the transfer of those blocks of less than 5% to multiple foreign companies under their control or whose nominee owners agreed to act at their direction. Third, the control groups employed three foreign trading platforms whose primary business purpose was to facilitate illegal securities transactions in United States securities markets by providing a layer of disguise to their control group clients. The control groups sold their stock through brokerage accounts maintained by at least three fraudulent trading platforms: Wintercap SA ("Wintercap"), Blacklight SA ("Blacklight") and the Bajic-Taneja Platform (collectively, the "Foreign Platforms").[1]

29.     "Pump-and-dump" schemes typically involve company shareholders touting, or "pumping," (or paying others to tout or "pump") a company's stock through false and misleading statements or through manipulative trading, for the purpose of creating market demand into which those same shareholders sell, or "dump," their shares.

## FACTS

### DEFENDANTS' BOILER ROOM IN COLOMBIA

30.     Beginning sometime before January 2016, Defendants Biller and Dove began operating a boiler room in Colombia. The primary business of Defendants' boiler room was to convince United States and Canadian investors to buy the stocks of the companies whose shares were being sold by the Defendants' control group clients. While the number of employees

---

[1] The three trading platforms and their operators were charged in separate cases. The Wintercap platform, operated by Roger Knox and his associates, was charged in *SEC v. Knox*, No. 18-cv-12058 (D. Mass., filed Oct. 2, 2018). The Bajic-Taneja and Blacklight platforms were charged in *SEC v. Bajic, et al.*, No. 20-cv-0007 (S.D.N.Y., filed Jan. 2, 2020).

working in the boiler room varied between 2016 and 2018, there were often at least 10 people working there, including each of the Defendants. Biller and Dove charged their clients up to 65% of the trading proceeds "captured" by their control group clients (that is, the aggregate proceeds of stock sales by the control group to investors contacted by the boiler room).

31.     Biller and Dove worked together as the leaders of the boiler room. They marketed the boiler room's services to individuals who represented various control groups, persuading them to hire the boiler room to sell particular companies' stock. Biller and Dove also functioned as "closers" or "loaders" in the boiler room. That means that once one of their junior employees (sometimes called "openers") got an investor interested in the boiler room's purported financial advisory organization, or persuaded an investor to purchase a small amount of a company's stock, Biller or Dove would then call that investor to try to persuade him/her to purchase more of that security, or another security being promoted by the boiler room.

32.     Alvarez was one of the employees who served as an "opener." As described in more detail below, Alvarez also engaged in manipulative trading in the stocks Defendants were preparing to promote, in order to encourage investors to purchase those shares. Alvarez's purchases of shares of stocks, which were then promoted by the boiler room, helped to increase the issuers' stock price before the promotional campaigns began, and in the first few weeks of the promotional campaigns.

33.     In the spring of 2018, Biller and Dove were looking for a new source of clients who had stock that could be promoted by their boiler room. Dove had previously partnered with an individual (referred to herein as "Person A") in a number of other pump and dump deals.[2] In

---

[2] Person A was previously charged by the Commission and by the U.S. Attorney's Office for the Eastern District of New York for his participation in various securities fraud schemes. That case is ongoing.

the spring of 2018, Person A introduced the Defendants to an individual ("Person B") who purported to be looking for a boiler room to promote several issuers' stocks. Unbeknownst to Person A and the Defendants, Person B was working in an undercover capacity with law enforcement officials and recorded his communications with Person A and the Defendants.

34.     On April 18, 2018, Dove, Person A, and Person B discussed the potential for Defendants' boiler room to be hired by Person B and his associates. Person B claimed that his associates controlled about 30 million shares of an issuer's stock, which was almost the entire float. During the call, Dove described the past success of Defendants' boiler room, stating: "Over the last two years, we've probably done 15 deals, and not a single one lasted for more than two months. Now that being said, the smallest number raised on any of those transactions . . . would have been like 3.5 million. And those were the deals that lasted the longest. We've done upwards of 10 million dollars on a deal in six weeks." The participants in the call also discussed how the boiler room would be paid and Dove explained that, for their promotional services, his group charged "a straight 65% of all captured sales" or in other words, "if week one we sell $500,000 worth of stock, then it's 65% of that."

35.     On that call, Dove also emphasized how important it was for his clients to control all of an issuer's float so that both his boiler room and the control group client would make the most money. Dove said, "Well, if they are gonna sell . . . Everyone . . . It would have to be 100% controlled," and further commented, "that's why we need to know what's actually in the float out there against us. If that's a big number, then it probably won't be worth starting."

36.     On that same call, Dove also described that the boiler room likes to have two deals to sell at about the same time. As he explained: "What we want to do is we want to have another one ready within six to eight weeks while the first one is still up and we'll have created

some kind of a story where the people can't buy the first one but because they are already so up on the first one, they trust us. They'll dump a lot more into the second one. We call it a Deal B. Deal B typically we get more back than a Deal A. So with the deal platter we sell . . . we want two deals to have the best rate of success . . . ."

37.    Dove also told Person B what his boiler room did to cover its tracks after the promotions for Deals A and B were finished. He explained that after those two deals are done, "we basically need to, you know, **reinvent . . . you know, create a new company name and all that stuff**, and then go into the next two." (emphasis added). This method of operation meant that the boiler room could not be located by disgruntled investors who lost money on the investments recommended by Defendants after their promotions were over.

38.    About a month later, on May 16, 2018, Person B visited Defendants' boiler room in Medellin, Colombia, so that he could see the operation for himself. While he was there, Person B met with Alvarez and Person A, and then met separately with Biller, Dove, and Person A.

39.    During those meetings, which Person B recorded on video, Alvarez explained to Person B the telephone pitch that the boiler room employees typically make to potential investors. He described his role as generating leads for the "loaders" (Biller and Dove). Alvarez stated that he would pretend to be from an investor relations firm and would tell the potential investor that his firm had recommended another security that had done very well and that they had another deal coming up soon.

40.    Alvarez also told Person B that Defendants routinely set up the websites for their fictitious investor relations firms, so that the firms "would look like a real company" if investors checked on them, and they would take the websites down immediately after the promotion

ended, so that investors could not complain to it (when they lost money on their investments).

41.     Alvarez explained that the boiler room had not in fact recommended the prior securities that had done well in the market—the Defendants just chose a stock that had performed well and took credit for it.  Alvarez would then encourage the potential investor to put money into his or her brokerage account and would then have a dialogue to build rapport with the potential investor.  Alvarez also told Person B that the boiler room employees told potential investors that their investor relations firm was in Naples, Florida, which they chose because it was an affluent area.

42.     During the meeting among Biller, Dove, Person A, and Person B, Biller described Dove as his partner in the boiler room and emphasized to Person B that he wanted to establish a relationship where they promoted multiple deals over time so that he could keep his employees working steadily.  Biller pressed Person B for a $150,000 advance payment in order to reserve the boiler room exclusively for Person B's prospective deals.

43.     During these meetings, Dove showed Person B the website of the fake investor relations firm the boiler room was claiming to be part of at that time.  He explained how the fake company added to the credibility of Defendants' pitch if investors questioned where they worked.

44.     When Person B asked Dove to describe the typical pitch to an investor, Dove explained that he would say: "Go into your trading account and buy the stock now!  Here's our history.  Here's what we've done before.  We normally do three deals a year.  Our average trading return over the past eight years has been about 300%.  Well, our last one did 1,800%.  So right now, take a position.  How much do you have available in your trading account right now?  Open it up…click the buy tab.  Here's the symbol.  Buy it!"  Dove added, "It's really that

simple."

45.     Biller added that it was often part of his pitch to tell investors that the stocks he was promoting would be listed on NASDAQ in about another three months.  Biller knew, or was reckless or negligent in not knowing, that those statements were false.  In describing his pitch to Person B, Biller implied that he did not actually believe that these companies would be able to uplist to the NASDAQ exchange (which would have required a significant price increase as well as lengthy and costly application and due diligence processes).

46.     Biller also explained to Person B that he would always use false names when talking to investors.  As an example, he said that currently he was telling investors he was a doctor who frequently appeared on television and added, "I tell them, 'I'll send you a copy of my book.  I'm scheduled to be on CNN again in mid-August.'"

47.     When Person B asked whether investors were often upset when they lost money on the stocks the boiler room had convinced them to buy, Dove replied: "Well, our phone lines are gonna be shut off . . . Remember, we reinvent ourselves every two deals . . . So we get them in the first deal, which is doing well (Deal A), and then we get them in the second deal, then there comes the day when we have to turn the phone lines off."  He added, "We have new phone lines ready to go, new company website, everything" so when the next deal starts, the Defendants have a new set of leads and they are not calling the same people again.  "Rinse and repeat . . . We get new leads coming in on a daily basis . . . We just got 250 today."

48.     In bragging about past deals to Person B, Dove and Biller specifically mentioned their involvement in promoting "PSNX, PSNP . . . and ORRP," and explained that "200 people [investors] on a deal is enough to generate two million bucks . . . typically we will have 600 buys and we could do six to ten million" (meaning that they could generate $6-10 million in sales on a

particular stock).  Biller claimed that the boiler room had generated $100 million of sales over its history.

49.     The following examples illustrate in greater detail how Defendants' conduct in selling particular issuers' securities followed the general scheme that Biller, Dove, and Alvarez described to Person B.

### EXAMPLE 1:  THE OROPLATA PUMP AND DUMP

50.     One of the issuers that Dove and Biller told Person B they promoted was ORRP (the ticker for Oroplata).  Defendants promoted Oroplata contemporaneously with sales made by their control group clients as described below.

### The Control Group's Trading In Oroplata

51.     By April 2016, a control group (the "ORRP Control Group") owned 100% of the float of Oroplata.  As described generally in paragraph 28 above, the ORRP Control Group divided Oroplata's stock into blocks of less than 5% of Oroplata's total number of shares outstanding, and transferred the ownership of those blocks of stock into at least seven foreign nominee entities such that each nominee owned, on paper, less than 5% of Oroplata's shares.

52.     The ORRP Control Group's stock was then deposited into brokerage accounts and sold by the three Foreign Platforms—who were all acting at the direction of the ORRP Control Group, and in particular at the direction of Luis Carrillo ("Carrillo")[3], who was a member of the ORRP Control Group.

53.     Collectively, between February 2016 and September 2016, the Foreign Platforms sold Oroplata stock into the demand created by Defendants' boiler room for trading proceeds of

---

[3] Carrillo was previously charged by the Commission for his participation in various securities fraud schemes. *See SEC v. Carrillo, et al.*, No. 21-cv-11272 (D. Mass., filed Aug.4, 2021).

approximately $13.1 million.

**Defendants Promoted Oroplata Stock**

54.    From on or about June 6, 2016, through at least September 2016, Defendants'

boiler room promoted Oroplata stock.  At that time, Defendants were using the names Market

Wi$e Report or Winford Report for their phony investor relations firm.  Thus, the boiler room's

employees told prospective investors that they worked for Market Wi$e Report or Winford

Report.

55.    Numerous investors bought Oroplata shares during at least August and September

2016 because they were encouraged to do so by people who identified themselves as calling

from Market Wi$e Report.  Francis Jonson was the false name being used by Biller at the time

for his boiler room work.  Biller, using the name of Francis Jonson, encouraged Investor #1 to

consider purchasing shares of Oroplata and told Investor #1 that he was able to get numerous

investors in at $0.90 and out at "well above 2 dollars" a share.

56.    Investor #2 purchased shares in Oroplata as well as other stocks promoted by

Defendants' boiler room, including PureSnax.  From about May through August 2016,

Investor #2 spoke, and exchanged emails, with a person who identified himself as a Market Wi$e

Report representative named Tomas Beneth.  Tomas Beneth was a false name used at the time by

Defendant Gran-Brooks.  Investor #2 also spoke to Biller, who was using the name Francis

Jonson, at least twice and received emails from him.  "Jonson" told Investor #2 that he was one

of the heads of Market Wi$e Report and led her to believe that Market Wi$e was a financial

advisory firm in Florida.  "Jonson" also told Investor #2 that the people working at Market Wi$e

Report had themselves invested in the stocks they were encouraging her to buy.  On the basis of

her conversations with Gran-Brooks and Biller, Investor #2 bought at least 26,500 shares of

Oroplata at an average price of $0.93 per share on June 6 and 7, 2016.  She also bought shares of

several other companies promoted by defendants during that time period, including PureSnax.  In her discussions with Gran-Brooks, Investor #2 made it clear to Gran-Brooks that she needed her investment savings to pay for surgery she was scheduled to undergo in the summer of 2016.

57.     Gran-Brooks acted negligently, recklessly, or knowingly when he made numerous false statements to convince Investor #2 to buy shares of Oroplata, PureSnax, and other companies, including statements that he guaranteed she would not lose money, that he always made sure his family owned the stocks he was encouraging Investor #2 to buy, and that he had much bigger positions in the stocks than Investor #2 was buying so she should not worry.

**Trading In Oroplata During Defendants' Promotions**

58.     Before June 2016, there was little trading in Oroplata.  Starting in June 2016, there was a significant increase in both the volume and price of Oroplata shares as illustrated in the graph below.  Between the first trade in Oroplata on February 24, 2016, and June 6, 2016, there were only 10 trading days when any purchases or sales of Oroplata stock were reported. On these 10 days, the average trading volume was less than 5,200 shares per day with an average closing price of approximately $0.44 per share.  Starting on June 6, 2016 and continuing through September 2016, the average volume of Oroplata trading was over 700,000 shares per day. Average closing prices increased throughout June to a peak in mid-July 2016 before decreasing again, as shown in the chart below.



59.     During Defendants' promotion of Oroplata between June 6 and August 15, 2016, the price of the stock ranged from $0.93 to $1.91.  By the end of September 2016, the stock's price had dropped to $0.545, and the price continued to fall, trading in a range between $0.10 and $0.20 per share into 2017, and eventually dropping below that.  Investors who purchased Oroplata on the Defendants' urging and held their shares lost significant sums of money.

### EXAMPLE 2: THE PURESNAX PUMP AND DUMP

60.     Another one of the issuers that Dove and Biller told Person B they sold was PSNX (the ticker for PureSnax).  Defendants promoted PureSnax contemporaneously with sales made by their control group clients as described below.

### The Control Group's Trading In PureSnax

61.     By January 2016, a control group containing at least Carrillo (the "PSNX Control Group") controlled 100% of the float of PureSnax.  The PSNX Control Group divided PureSnax's stock into blocks of less than 5% of PureSnax's total number of shares outstanding

and transferred the ownership of those blocks of stock to foreign nominee entities so each nominee owned, on paper, less than 5% of PureSnax's shares.

62.     The PSNX Control Group's stock was then deposited into brokerage accounts and sold by two of the three Foreign Platforms, who were acting at the direction of the PSNX Control Group, and in particular took trading directions from Carrillo.

63.     Collectively, between March 2016 and September 2016, two of the Foreign Platforms sold PureSnax stock into the demand created by Defendants' boiler room for trading proceeds of at least $1.4 million.

**Defendants Promoted PureSnax**

64.     From at least mid-March through mid-July 2016, Defendants' boiler room promoted PureSnax stock.  Defendants' PureSnax promotion overlapped with the time period of their Oroplata promotion, and Defendants used the phony investor relations firm names of Market Wi$e Report or Winford Report to conduct both promotions.  As in the Oroplata promotion, the boiler room's employees who were promoting PureSnax told prospective investors that they worked for Market Wi$e Report or Winford Report.

65.     Numerous investors bought PureSnax shares between March and July 2016 because they were encouraged to do so by people who identified themselves as calling from Market Wi$e Report.  For example, Investor #1 purchased 20,000 shares of PureSnax at an average price of $0.59 on April 11, 2016, after speaking with Biller, who identified himself as Francis Jonson.  Investor #1 purchased an additional 90,000 shares of PureSnax at an average price of $0.60 on April 15, 2016 after speaking with Biller (posing as Jonson) a second time.  Biller reassured Investor #1 after a price dip in PureSnax on May 10, 2016, that PureSnax was not, as Investor #1 worried, "a house of cards that is starting to tumble."  Biller (posing as Jonson) also sent out a promotional email on May 31, 2016, telling investors that "[y]our

patience is about to be rewarded" for investing in PureSnax and that "PSNX will be moving into phase 2 over the next 2 to 3 business days.  We expect to see a dramatic increase in both volume and share price appreciation.  The wait is over!"  Another email from Biller (as Francis Jonson) on June 17, 2016, (after a decline in PureSnax's price and trading volume) encouraged Investor #1 to "Get PSNX on your screen now! . . . . You don't get an opportunity like this everyday, especially with a company expected to grow so large and so fast.  Drop everything you're doing now, because this could be the last time you see PSNX at this level with a breakout potential."  On Biller's urging, Investor #1 held on to all of his PureSnax shares and ultimately lost over $70,000.

66.    Investor #2 purchased 7,000 shares of PureSnax between April 2 and 27, 2016 and ultimately purchased a total of 21,200 shares of PureSnax by July 6, 2016.  On the urging of Gran-Brooks (posing as Beneth), Investor #2 held on to all of her PureSnax shares.  When Investor #2 got nervous about drops in the price of PureSnax, Gran-Brooks told her that she should not sell, and that the price would come back.  Gran-Brooks also told her that his sister was invested in PureSnax, and he would not let her get hurt.  Gran-Brooks also told Investor #2 that Market Wi$e clients had to follow their program if they wanted information about other stocks that would do well.  Gran-Brooks told investor #2 that following the program meant not selling until they advised her to sell.  Investor #2 lost over $11,800 investing in PureSnax.

67.    Investor #3 purchased PureSnax shares after being called by an individual identifying himself as Richard van Geld from Market Wi$e Report and receiving follow-up calls from people calling themselves Francis Jonson and Chris Sterling, claiming to be from the same firm.  Richard van Geld was a name used by Justin Plaizier, and Chris Sterling was a name used by Dove, when they called investors through Defendants' boiler room.  Investor #3 initially

purchased PureSnax shares because Plaizier (posing as van Geld) told him that the shares would

increase in price in several days and would get to $1 or more. Plaizier did not, however, tell

Investor #3 that the reason he knew PureSnax shares would increase in price is because he and

the boiler room employees were actively soliciting many investors to buy those shares. In

context, Plaizier's statements to Investor #3 were materially misleading and were made

negligently, recklessly, or knowingly.

68.    Follow up calls from Dove (posing as Sterling) and Biller (posing as Jonson)

invited Investor #3 into Market Wi$e's "inner circle" so that he could get investment advice

from them as leaders of Market Wi$e. Biller and Dove emphasized to Investor #3 that in order

to be part of the "inner circle" he should not sell the stocks they advised him to buy until they

told him to sell, even if the price dropped. To lull Investor #3 into holding onto PureSnax shares

in the face of declining share prices, Biller told Investor #3 that one price decline in PureSnax

stock was attributable to a large investor having to sell his shares to make a margin call on his

portfolio caused by a bad investment in a diamond mine. Investor #3 followed their instructions

not to sell until told to do so for a period of time. Between April 12, 2016 and September 27,

2016, Investor #3 bought a total of over 156,000 shares of PureSnax, spending over $65,800.

Investor #3 sold some of his PureSnax shares, recovering about $23,800 of his investment, but

the remaining stock is worthless. Overall, Investor #3 lost approximately $42,000 on his

PureSnax investment and additionally lost over $100,000 on other stocks he purchased at the

urging of Plaizier, Biller, and Dove.

**Trading In PureSnax During Defendants' Promotions**

69.    Before early March 2016, there was little trading in PureSnax. Beginning in early

March 2016, there was a significant increase in both the volume and price of PureSnax shares as

illustrated in the graph below. Before March 10, 2016, there were only 11 days during 2016 on

which PureSnax trades were reported and its average trading volume was less than 3,800 shares per day.  From March 10, 2016 until the end of July 2016, its average volume increased to almost 110,000 shares per day.  The closing price of PureSnax stock rose from around $0.30 before the promotion to its highest closing price of $.804 and .805 on May 4 and 5, 2016.



70.    During Defendants' promotion of PureSnax, the price of the stock rose to a high of $0.895 per share.  Once the Defendants' boiler room stopped promoting PureSnax, the stock's price dropped quickly to below $0.01 per share by September 22, 2016.  Many investors who purchased PureSnax on the Defendants' urging thus lost significant sums of money.

### EXAMPLE 3:  THE GARMATEX PUMP AND DUMP

71.    During the spring of 2017, Defendants' boiler room ran a promotional campaign encouraging potential investors to purchase shares of Garmatex (whose ticker was GRMX). Defendants promoted Garmatex contemporaneously with sales made by their control group clients as described below.

**The Control Group's Trading In PureSnax**

72.     By March 2017, a control group composed of at least Carrillo (the "Garmatex Control Group") controlled nearly 90% of the float of Garmatex.  Following the pattern of Oroplata and PureSnax, the Garmatex Control Group's shares were divided into blocks of less than 5% of Garmatex's total number of shares outstanding, and transferred into at least six foreign nominee entities such that each nominee owned, on paper, less than 5% of Garmatex's shares.

73.     In March and April 2017, those nominees' stock was deposited into brokerage accounts and sold by two of the three Foreign Platforms.  Wintercap took its trading directions when selling Garmatex stock from Carrillo.  By May 15, 2017, the Garmatex Control Group had sold every share that had been transferred to the Foreign Platforms.

74.     Collectively, between March 2017 and May 2017, the Garmatex Control Group sold at least 12.2 million shares of Garmatex stock into the demand created by Defendants' boiler room, for trading proceeds of over $7,000,000.

**Defendants Promoted Garmatex**

75.     From about mid-March to May 2017, Defendants' boiler room promoted Garmatex stock.  By the time of the Garmatex promotion, Defendants had stopped using the name Market Wi$e Report for their phony investor relations firm.  By 2017, the Defendants had begun using the name Global Stock Advantage.  Thus, the boiler room's employees told prospective investors that they worked for Global Stock Advantage.  False names used by the people working in the Defendants' boiler room in 2017 included Dr. Peter Phillips (used by Biller), and Craig Morgan (used by Dove) and Sid Wexler.

76.     Numerous investors bought Garmatex shares during March through May of 2017 after being solicited by callers who identified themselves as working for Global Stock

Advantage.  For example, Investor #4 began purchasing Garmatex shares on March 14, 2017, after receiving an introductory call from a person going by the name of Sid Wexler, and more detailed calls from persons using the names of Dr. Peter Phillips (who claimed to be a Ph.D. in economics) and Craig Morgan.

77.    Biller, claiming to be Dr. Peter Phillips, made numerous misrepresentations to Investor #4 including that: 1) his firm, Global Stock Advantage ("GSA"), looked for and assisted undervalued companies that could thrive on the NASDAQ stock exchange; 2) Phillips and Morgan had left a large Canadian brokerage firm after 20 years to start GSA; 3) Garmatex was about to announce big deals with a Fortune 500 company and an upholstery company that supplied high-end car manufacturers; 4) Garmatex would be moving to the NASDAQ stock exchange on July 7, 2017; 5) Morgan Stanley was arranging a private purchase of 4.25 million shares of Garmatex; and 6) independent research firms had already valued Garmatex at $9 per share.

78.    Dove, claiming to be Craig Morgan, also made misrepresentations to Investor #4 including a representation that GSA only assisted companies that had revenue growth of 50% per year and had a known product to execute a reverse merger and become public without an initial public offering—implying that Garmatex was such a company.

79.    Biller and Dove knew or were reckless or negligent in not knowing that their statements were false or misleading when they were made.  They had no reason to believe that Garmatex had any plans to move to the NASDAQ stock exchange, let alone that it would do so in July 2017.  Nor did they disclose that they were promoting Garmatex on behalf of a control group that was dumping its shares into the demand created by the Defendants' promotion.

80.    Investor #4 was an investment adviser nearing retirement who invested, and lost,

most of his retirement savings to Defendants' fraudulent scheme.  Investor #4 purchased more than 3 million shares of Garmatex for a total loss on his investment of over $2 million.

**Trading In Garmatex During Defendants' Promotions**

81.    Before March 2017, there was little trading in Garmatex shares.  In approximately mid-March 2017, at about the same time that Carrillo orchestrated the deposit of the foreign nominees' shares into brokerage accounts, there was a significant increase in both the volume and price of Garmatex shares as illustrated in the graph below.  Between February 7, 2017, and March 10, 2017, the average daily volume of trading in Garmatex stock on those days when it traded was less than 90,000 shares.  On the first day of the Defendants' boiler room promotion, March 14, 2017, volume spiked to over 5 million shares.  Between March 14, 2017, and May 2, 2017 (the last day that the Garmatex Control Group sold stock), the average volume was over 1.5 million shares per day.  The closing price of Garmatex stock rose from $0.40 before the promotion to its highest closing price of $1.21 on March 23, 2017.



82.    Once the Defendants' boiler room stopped promoting Garmatex, the stock's price dropped to less than $0.20.  Many investors who had purchased Garmatex on the Defendants' urging thus lost significant sums of money.

## DEFENDANTS' BOILER ROOM PROMOTED ADDITIONAL ISSUERS

83.    Defendants' boiler room promoted the stocks of numerous issuers that were sold by their control group clients through the Foreign Platforms and otherwise.  The following chart summarizes the stocks that were promoted by the Defendants and the trading proceeds that their control group clients reaped by selling into the demand created by the Defendants' fraudulent conduct:

| ISSUER | WINTERCAP | BAJIC-TANEJA | BLACKLIGHT | PERSON A'S ENTITY | MINIMUM TRADING PROCEEDS (COST) |
|---|---|---|---|---|---|
| ORRP | $ 11,776,557 | $ 6,620 | $ 1,364,743 | $ - | $ 13,147,920 |
| CATQ / FTWS | $ 10,060,797 | $ - | $ (826,494) | $ - | $ 9,234,303 |
| GRMX / EVBC | $ 4,971,311 | $ - | $ 2,073,261 | $ - | $ 7,044,571 |
| DIGAF | $ 4,908,402 | $ - | $ 670,082 | $ - | $ 5,578,484 |
| ETII | $ 10,100 | $ 4,185,497 | $ 412,267 | $ - | $ 4,607,864 |
| PSCR | $ 3,798,622 | $ - | $ (821,585) | $ - | $ 2,977,036 |
| SRUP | $ 2,647,585 | $ - | $ - | $ - | $ 2,647,585 |
| ARSN | $ 2,975,583 | $ 7,317 | $ (460,502) | $ - | $ 2,522,398 |
| GLLK | $ 2,491,458 | $ 258,615 | $ (400,984) | $ - | $ 2,349,088 |
| AVOP | $ - | $ - | $ - | $ 2,139,578 | $ 2,139,578 |
| SPRN | $ 1,326,243 | $ 554,375 | $ 78,692 | $ - | $ 1,959,310 |
| PSNP | $ 2,074,442 | $ 27,137 | $ (465,504) | $ - | $ 1,636,075 |
| PSNX | $ 1,387,926 | $ - | $ 4,736 | $ - | $ 1,392,662 |
| IWMG | $ 422,539 | $ - | $ (8,617) | $ - | $ 413,923 |
| MONK | $ - | $ - | $ 314,117 | $ - | $ 314,117 |
| PTAE | $ 39,521 | $ - | $ | $ - | $ 39,521 |
| APTY | $ - | $ - | $ (272,392) | $ 573,395 | $ 301,003 |
| SNET | $ - | $ - | $ - | $ 85,548 | $ 85,548 |
| **MINIMUM TRADING PROCEEDS (COST)** | **$ 48,891,086** | **$ 5,039,561** | **$ 1,661,820** | **$ 2,798,521** | **$ 58,390,988** |

## ALVAREZ'S MANIPULATIVE TRADES

84.    In addition to calling potential investors to solicit their purchases of the securities that were touted by Defendants' boiler room, Alvarez also engaged in manipulative trading in advance of, or early in, Defendants' promotional activity that was designed to drive up reported sales prices of the shares the Defendants were encouraging investors to buy.  Alvarez routinely

engaged in this manipulative trading on securities that were promoted by Defendants' boiler room.

85.     Alvarez's trading was funded, in part, by payments from the Defendants' control group clients, including Person A.  For example, on June 14, 2016, Person A wired $9,560 to a firm controlled by his associate.  On the same day, the associate's firm wired $9,500 directly into Alvarez's brokerage account.  Over the next seven days, Alvarez spent $9,500 to buy shares of Oroplata, PureSnax, and two other securities then being promoted by Defendants' boiler room.

86.     Alvarez's purchases of Aureus shares are illustrative of his manipulative trading. Aureus shares began trading in the public markets on July 22, 2016.  Between July 22 and August 3, 2016, there were few Aureus trades in the public markets and the average daily volume of shares traded was under 20,000 shares a day.  On July 27, 2016, Alvarez purchased 101 shares of Aureus for $0.60 per share, an increase of 100% over the prior day's closing price. The price of Aureus increased again dramatically on July 29, 2016, such that its closing price of $1.50 was almost $1 more than the prior day's closing price of $0.583.  Alvarez traded in Aureus again on the next day its shares traded: August 3, 2016.  On August 3, 2016, Alvarez bought 100 shares of Aureus at $2.48 per share, a 65% increase over the prior day's closing price.  Alvarez was the only purchaser in the market on August 3.  It is significant that Alvarez traded in 100 share blocks because only trades of 100 or more shares would be reported and visible to potential investors in the market.  Alvarez's trades in Aureus created the misleading impression that there was legitimate market demand at the higher prices he was paying for Aureus shares, and were designed to induce other people to invest.

87.     Defendants' boiler room began actively promoting Aureus shares on August 4, 2016. Beginning on August 4, the number of daily trades in Aureus increased substantially.  For

example, while the highest volume in the prior month was about 85,000 shares traded on July 22, 2016, there were over 5.5 million shares traded on August 4, 2016.

88.     While the Defendants' boiler room was actively promoting Aureus throughout August 2016, Alvarez continued to make small purchases of Aureus shares in 100 share blocks on at least seven trading days, at prices at or near the high point of the day's price.  Alvarez's continued trades in Aureus created the misleading impression that there was market demand for Aureus stock at the high prices he was paying for those shares, and were designed to induce other people to invest.

89.     Alvarez's conduct in buying Garmatex shares was similar.  Between September 2016 and February 2017, there was little market trading in Garmatex shares.  In fact, Garmatex shares only traded on 14 days within that five-month period.

90.     On March 1, 2017, Alvarez purchased 100 Garmatex shares at a price of $0.77, a $0.07 increase over the prior day's closing price.  On March 2, 2017, Alvarez bought 200 shares of Garmatex, again at a price of $0.77, which was the day's high price.  On March 3, 2017, Alvarez purchased 100 shares of Garmatex at a price of $0.78, just a penny under the day's high price of $0.79.  Alvarez's trades in Garmatex created the misleading impression that there was market demand for Garmatex stock at the higher prices he was paying for Garmatex shares, and were designed to induce other people to invest.

91.     When Defendants' boiler room began actively promoting Garmatex, on or about March 14, 2017, the volume of shares traded each day increased dramatically.  For example, on March 13, 2017, about 160,000 Garmatex shares traded, whereas more than 5 million shares traded on March 14 once Defendants began their promotion.

92.     During the time period that Defendants' boiler room was actively promoting

Garmatex in March and April 2017, Alvarez made additional trades to support the price of Garmatex shares. On at least 14 additional trading days during those two months, Alvarez purchased Garmatex shares, in 100 share blocks, at prices that were at or near the high of each day's trading.

93.     Alvarez's trading in shares of Proto Script Pharmaceutical Corp. ("Proto") followed the same pattern. Between June and November 2016, trading in Proto shares in the market was very light. In fact, Proto shares traded in the markets on only 12 days in that time period.

94.     On December 5, 2016, Alvarez purchased 100 shares of Proto at a price of $0.51 per share. This was the only trade in the market that day and the price he paid was an increase of about 62% over the prior trading day's price. There were no trades in Proto shares after Alvarez's trade until the Defendants' boiler room began promoting Proto on or about December 14, 2016. Alvarez's trade thus set the starting price point for Defendants' promotions of Proto shares. Alvarez's trade in Proto was designed to create the misleading impression that there was market demand at the higher prices he paid for Proto shares, and was designed to induce other people to invest.

95.     Once Defendants' boiler room began promoting Proto, the volume increased substantially, to over 2.5 million shares traded on December 15, 2016. While the Defendants were actively promoting Proto, in December 2016 and January 2017, Alvarez continued to make additional purchases of Proto in 100 share blocks to support the price of Proto shares. He made those purchases on at least 16 trading days in December 2016 and January 2017, at prices at or near the high price of the day, or at times when the price of his trade was an increase over the then-current trading price.

**DEFENDANTS RECEIVED PROCEEDS OF THE FRAUDULENT TRADES**

96.     Based on information presently available to the Commission, between January 1, 2016 and the present, Defendant Dove directly received payments totaling over $1.8 million that represented his share of trading proceeds from the penny stocks promoted by Defendants' boiler room.  Defendant Alvarez received at least $89,484, while Defendant Gran-Brooks received at least $469,968 and Defendant Plaizier received at least $112,254.  Those payments came from the following sources:

| Source | Received by Dove | Received by Alvarez | Received by Gran-Brooks | Received by Plaizier |
|---|---|---|---|---|
| Wintercap SA (foreign trading platform) | $456,400 | | $176,404 | |
| Shredderz International | | $72,000 | $293,564 | $112,254 |
| Person A and his associate | $1,347,143 | $17,484 | | |
| **Total** | **$1,803,543** | **$89,484** | **$469,968** | **$112,254** |

97.     In addition to these cash payments, Biller and Dove received other items of value from their control group clients.  For example, Wintercap, one of the trading platforms used by Defendants' control group clients, paid the equivalent of over $95,000 for a ski vacation in Switzerland for Carrillo, Dove, Biller, and their families that lasted from December 27, 2017, to January 5, 2018.  Wintercap charged these expenses to the account of Carrillo.  Similarly, on or about January 17, 2018, Carrillo purchased a very expensive watch for Dove and shipped it to him in Japan.

**MONETARY TRANSFERS TO THE RELIEF DEFENDANTS**

98.     Defendants transferred or directed, directly or indirectly, millions of dollars of trading proceeds from the fraudulent conduct described above to the Relief Defendants for no legitimate purpose or consideration.  In particular, Defendant Biller appears to have directed his

share of the proceeds from Defendants' boiler room to his wife and family members rather than to accounts in his own name.

99.     Based on information presently available to the Commission, on numerous dates between January 1, 2016, and the present, Defendants' control group clients and the foreign trading platforms that they used transferred sums of money from trading proceeds in the stocks promoted by Defendants' boiler room: (a) to accounts in the name of, or for the benefit of, Biller's wife, Salazar; (b) to relief defendant Giraldo; (c) to relief defendant Clarke; and (d) to Shredderz, a company owned by Dove.  The following chart shows the sources and amounts of those transfers.  As shown below, Shredderz received $4,693,000 from Wintercap and paid out $3,808,430 to individuals involved in Defendants' fraudulent scheme.

| Source | Received by Salazar | Received by Giraldo | Received by Clarke | Received by Shredderz |
|---|---|---|---|---|
| Wintercap SA (foreign trading platform) | $110,000 | | $486,070 | $4,693,000 |
| Shredderz International | $1,696,315 | $1,158,235 | | ($3,808,430) |
| Person A and his associate | $1,114,953 | $777,552 | $148,495 | |
| Carrillo | $90,000 | $140,000 | | $761,000 |
| **Total** | **$3,011,268** | **$2,075,787** | **$634,565** | **$1,645,570** |

**FIRST CLAIM FOR RELIEF**
**FRAUD IN THE OFFER OR SALE OF SECURITIES**
**(Violations of Section 17(a) of the Securities Act)**
**(Defendants Biller, Dove, Alvarez, Gran-Brooks and Plaizier)**

100.    Paragraphs 1 through 99 above are re-alleged and incorporated by reference as if fully set forth herein.

101.    By reason of the conduct described above, Defendants, in the offer or sale of securities, by the use of the means or instrumentalities of interstate commerce or of the mails, directly or indirectly, acting intentionally, knowingly, recklessly or negligently (i) employed

devices, schemes, or artifices to defraud; (ii) obtained money or property by means of any untrue statement of a material fact or any omission to state a material fact necessary in order to make the statements made, in light of circumstances under which they were made, not misleading; and (iii) engaged in transactions, practices, or courses of business which operated or would operate as a fraud or deceit upon any persons, including purchasers or sellers of the securities.

102.    By reason of the conduct described above, Defendants violated Securities Act Section 17(a) [15 U.S.C. §77q(a)].

<div align="center">

**SECOND CLAIM FOR RELIEF**
**FRAUD IN CONNECTION WITH THE PURCHASE OR SALE OF SECURITIES**
**(Violations of Section 10(b) of the Exchange Act and Rule 10b-5 thereunder)**
**(Defendants Biller, Dove, Alvarez, Gran-Brooks and Plaizier)**

</div>

103.    Paragraphs 1 through 99 above are re-alleged and incorporated by reference as if fully set forth herein.

104.    By reason of the conduct described above, Defendants, directly or indirectly, in connection with the purchase or sale of securities, by the use of the means or instrumentalities of interstate commerce or of the mails, or of any facility of any national securities exchange, intentionally, knowingly or recklessly, (i) employed devices, schemes, or artifices to defraud; (ii) made any untrue statement of a material fact or omitted to state a material fact necessary in order to make the statements made, in light of the circumstances under which they were made not misleading; and (iii) engaged in acts, practices, or courses of business which operated or would operate as a fraud or deceit upon any persons, including purchasers or sellers of the securities.

105.    By reason of the conduct described above, Defendants violated Exchange Act Section 10(b) [15 U.S.C. §78j(b)] and Rule 10b-5 [17 C.F.R. §240.10b-5] thereunder.

### THIRD CLAIM FOR RELIEF
### <u>MANIPULATION OF SECURITIES PRICES</u>
### (Violation of Section 9(a)(2) of the Exchange Act)
### (Defendant Alvarez)

106.    Paragraphs 1 through 99 above are re-alleged and incorporated by reference as if fully set forth herein.

107.    By reason of the conduct described above, Alvarez effected, alone or with one or more other persons, a series of transactions in at least one security that was not a government security, that created actual or apparent active trading in that security, or raised or depressed the price of that security, for the purpose of inducing the purchase or sale of that security by others.

108.    By reason of the conduct described above, Alvarez violated Exchange Act Section 9(a)(2) [15 U.S.C. §78i(a)(2)].

### FOURTH CLAIM FOR RELIEF
### OTHER EQUITABLE RELIEF, INCLUDING UNJUST ENRICHMENT AND
### <u>CONSTRUCTIVE TRUST</u>
### (Relief Defendants)

109.    Paragraphs 1 through 99 above are re-alleged and incorporated by reference as if fully set forth herein.

110.    Section 21(d)(5) of the Exchange Act [15 U.S.C. §78u(d)(5)] states, "In any action or proceeding brought or instituted by the Commission under any provision of the securities laws, the Commission may seek, and any Federal court may grant, any equitable relief that may be appropriate or necessary for the benefit of investors."

111.    The Relief Defendants have received investor funds derived from the unlawful acts, practices, and scheme of the Defendants under circumstances dictating that, in equity and good conscience, they should not be allowed to retain such funds.

112.    Further, specific property acquired by the Relief Defendants is traceable to Defendants' wrongful acts, and there is no reason in equity why the Relief Defendants should be

entitled to retain that property.

113.    As a result, the Relief Defendants are liable for unjust enrichment and should be required to return their ill-gotten gains, in an amount to be determined by the Court.  The Court should also impose a constructive trust on property in the possession of the Relief Defendants that is traceable to the Defendants' wrongful acts.

### PRAYER FOR RELIEF

WHEREFORE, the Commission respectfully requests that this Court:

A.    Permanently restrain the Defendants, their officers, agents, servants, employees and attorneys, and those persons in active concert or participation with them who receive actual notice of the injunction by personal service or otherwise, and each of them, from violating Section 17(a) of the Securities Act [15 U.S.C. §77q], and Section 10(b) of the Exchange Act [15 U.S.C. §78j(b)], and Rule 10b-5 thereunder [17 C.F.R. §240.10b-5]; and permanently restrain Alvarez, his agents, servants, employees and attorneys and those persons in active concert or participation with him who receive actual notice of the injunction by personal service or otherwise, and each of them, from violating Section 9(a)(2) of the Exchange Act [15 U.S.C. §78i(a)(2)];

B.    Order the Defendants to disgorge, with prejudgment interest, all ill-gotten gains obtained by reason of the unlawful conduct alleged in this Complaint pursuant to Section 21(d)(7) of the Exchange Act [15 U.S.C. §78u(d)(7)];

C.    Order the Defendants to pay civil monetary penalties pursuant to Section 20(d) of the Securities Act [15 U.S.C. §77t(d)] and Section 21(d)(3) of the Exchange Act [15 U.S.C. §78u(d)(3)];

D.      Enter an order barring the Defendants from participating in any offering of a penny stock, pursuant to Section 20(g) of the Securities Act [15 U.S.C. §77t(g)] and/or 21(d) of the Exchange Act [15 U.S.C. §78u(d)];

E.      Order the Relief Defendants to disgorge, with prejudgment interest, all ill-gotten gains obtained by reason of the unlawful conduct alleged in the Complaint;

F.      Retain jurisdiction over this action to implement and carry out the terms of all orders and decrees that may be entered; and

G.      Grant such other and further relief as this Court may deem just and proper.

### JURY DEMAND

The Commission demands a jury in this matter for all claims so triable.


DATED:  March 14, 2022

<div style="margin-left:40%">

Respectfully submitted,


/s/ Alicia Reed_____
Alicia Reed (NY Bar No. 4913596)
Kathleen Burdette Shields (Mass Bar No. 637438)*
Jonathan R. Allen (Mass Bar No. 680729)*
Amy Gwiazda (Mass Bar No. 663494)*
SECURITIES AND EXCHANGE COMMISSION
Boston Regional Office
33 Arch St., 24th Floor
Boston, MA 02110
Phone:  617-573-8904 (Shields)
Fax:     617-573-4590
shieldska@sec.gov

*Not admitted in the U.S. District Court for the Eastern District of New York

</div>