UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK
-----------------------------------X
SECURITIES AND EXCHANGE COMMISSION,

*Plaintiff*,

- against -

FRANCIS BILLER, RAYMOND DOVE, CHESTER ALVAREZ, TROY GRAN-BROOKS AND JUSTIN PLAIZIER.,

*Defendants*, *and*

LIA PATRICIA SEPULVEDA SALAZAR, EDWARD LOPEZ GIRALDO, EDWARD CLARKE AND SHREDDERZ INTERNATIONAL CORP.,

*Relief Defendants*.
-----------------------------------X

**MEMORANDUM & ORDER**

No. 22-CV-01406 (KAM)(CLP)

**KIYO A. MATSUMOTO, United States District Judge:**

Pending before the Court is Plaintiff Securities and Exchange Commission's ("SEC") third motion for entry of default judgment against (1) defendant Raymond Dove ("Dove"); and (2) relief defendant Shredderz International Corporation ("Shredderz"). (ECF No. 57.) For the reasons set forth below, the SEC's motion for default judgment is **GRANTED as to Dove** but **DENIED without prejudice as to Shredderz** for lack of personal jurisdiction.

## BACKGROUND

### I. Factual Background

As set forth in the complaint, the SEC alleges that, between 2016 and 2018, defendants Francis Biller ("Biller"), Dove, Chester Alvarez ("Alvarez"), Troy Gran-Brooks ("Gran-Brooks"), and Justin

Plaizier ("Plaizier") (collectively, the "Defendants") ran or participated in a boiler room operation out of Medellin, Colombia, to defraud investors into buying penny stocks. (ECF No. 1, "Complaint" or "Compl." ¶¶ 30-99.) Defendants were hired by groups of people who were "affiliates" (the "Control Groups"), of at least eighteen issuers, companies whose securities are publicly traded and whose shares were sold by Defendants to retail investors through false representations. (*Id.* ¶¶ 2, 3, 26-27, 30.) The Control Groups would transfer an issuer's securities to multiple foreign companies under the Control Group's control or "whose nominee owners agreed to act at [the Control Group's] direction." (*Id.* ¶ 28.) The Control Groups used three fraudulent foreign trading platforms to sell their stock: Wintercap SA ("Wintercap"), Blacklight SA, and the Bajic-Taneja Platform (collectively, the "Foreign Platforms"). (*Id.* ¶ 28.) By generating fraudulent market activity in the issuer's stock, Defendants created a fraudulent market which enabled the Control Groups to sell its own stock at an artificially high price. (*See, e.g.*, *id.* ¶¶ 59, 70, 82.) After the Control Groups sold their shares, the retail investors were left with stock that had little or no value. (*Id.*)

Of all the Defendants, Biller and Dove played the largest role in the scheme. Biller and Dove set up the boiler room in Medellin and recruited salesmen, like Plaizier, Alvarez, and Gran-Brooks, to push the sales of the Control Groups' stock. (*Id.* ¶¶

31, 33.) Sales proceeds would be paid directly to the issuer or its associated Control Group, which would then pay 65% of those proceeds to the criminal operation. (*Id.* ¶ 30.) Those illicit proceeds were then distributed to Dove, Alvarez, Gran-Brooks, and Plaizier. (*See id.* ¶ 96.) The Complaint does not allege how much of the proceeds were distributed to Biller. (*See id.* ¶ 98.) As alleged in the Complaint and relevant to the instant motion, Dove received $1,803,543 from the criminal operation. (*Id.* ¶ 96.) In addition to cash payments, Biller and Dove received other items of value from the Control Groups, including funding expensive ski vacations and watches. (*Id.* ¶ 97.)

The relief defendants include Shredderz International Corp. ("Shredderz"), a company incorporated by Dove and of which he is the sole officer and director. (*Id.* ¶¶ 98, 99.) Shredderz allegedly received $1,645,570 from the scheme. (*Id.* ¶¶ 21, 99.)

**II. Procedural Background**

On March 14, 2022 the SEC filed the complaint against defendants Biller, Dove, Alvarez, Gran-Brooks, and Plaizier and relief defendants Lia Patricia Sepulveda Salazar, Edward Lopez Giraldo, Edward Clarke, and Shredderz International Corp (collectively, the "Relief Defendants"). (*See generally* Complaint.)

On March 25, 2022, the SEC effectuated service on Shredderz. (ECF No. 21.) On October 11, 2022, the SEC effectuated service on

Dove and Clarke. (ECF Nos. 23, 24.) Neither Dove, Clarke, nor Shredderz answered the Complaint. On October 19, 2022, the Clerk's Entry of Default was entered against Shredderz. (ECF No. 28.) On November 14, 2022, the Clerk's Entry of Default was entered against Dove and Clarke. (ECF Nos. 31, 32.) On November 18, 2022, the SEC filed its first motion for default judgment as to Shredderz. (*See* ECF No. 34.) Shortly thereafter, on December 13, 2022, the SEC filed its first motion for default judgment as to Dove and Clarke. (*See* ECF No. 35.)

On February 6, 2023, the Court denied the SEC's motions for default judgment, finding that the SEC did not meet the standard for resolving some, but not all, claims under Federal Rule of Civil Procedure 54(b), particularly where Biller, Alvarez, Gran-Brooks, and Plaizier had not yet been served. *Sec. & Exch. Comm'n v. Biller*, 654 F. Supp. 3d 212, 214-216 (E.D.N.Y. 2023). The SEC's motions were denied without prejudice to renew upon changes to the case's procedural posture. *Id.* at 216. Since the denial of the SEC's first motions for default judgment, defendants Biller, Plaizier, Gran-Brooks, and Alvarez have since waived service and have entered into consent judgments in this action. (*See* ECF Nos. 38, 39, 40, 41, 52, 56.)

On January 24, 2025, the SEC filed its second motion for default judgment as to Dove, Shredderz, and Clarke, renewing and incorporating its arguments from its first motions for default

judgment. (*See* ECF No. 51.) On September 17, 2025, the Court denied the SEC's second motion for default judgment because the SEC failed to "affix any exhibits or affidavits from an individual with personal knowledge which attest to the calculation of the aforementioned disgorgement figures, or to provide any substantiation or support for" the disgorgement amounts requested, which was insufficient for the SEC to meet its burden of "'establishing a reasonable approximation of the profits causally related to the fraud[.]'" (9/17/25 Dkt. Order (quoting *SEC v. Razmilovic*, 738 F.3d 14, 31 (2d Cir. 2013) (citation modified)).)

On September 26, 2025, the SEC filed its third motion for default judgment against Dove and Shredderz but did not request default judgment against Clarke, (ECF No. 57, the "Motion" or "Mot.".) The same day, the Court directed the SEC to file by November 14, 2025, "supplemental briefing specifying, with supporting documentation, the exact dollar amount it is seeking as a civil penalty against Defendant Raymond Dove" and "confirming that it will not be seeking default judgment against Relief Defendant Edward Clarke." (9/26/25 Dkt. Order.) Following an extension of time to file, the SEC filed its supplemental memorandum regarding the civil penalty amount requested as to Dove in support of the Motion on December 11, 2025. (ECF No. 60, the "Motion Supplement" Or "Mot. Suppl.") On December 11, 2025, the SEC also filed a notice of voluntary dismissal with prejudice of

its claims in the complaint against Clarke. (ECF No. 59.)

On September 11, 2026, the Court ordered the SEC to file a supplemental affidavit confirming through post-default investigation, that Dove was not in active military service and affirming that the SEC served both the Motion and Motion Supplement. (9/11/2026 Dkt. Order.) On September 15, 2026, the SEC filed a supplemental declaration in support of the Motion affirming that the SEC served Dove with the Motion on September 26, 2025 and the Motion Supplement on December 11, 2025; that "[g]iven the passage of time" the SEC was unable to confirm that the SEC served the Motion on Shredderz by mail in September 2025 at the same address the SEC served Shredderz with the Complaint but stated "[i]t would have been [the SEC's] ordinary practice to do so," and the SEC has since re-mailed the Motion; that the SEC served Shredderz via mail with the Motion Supplement on December 11, 2025; and that Mr. Dove was not in active military service after post-default investigation. (ECF No. 61 ¶¶ 2-5.)

On September 28, 2026, the Court ordered the SEC to file an amended up to date proposed final judgment and prejudgment interest report as to Dove reflecting up to date prejudgment interest figures, which the SEC filed on September 29, 2026. (ECF No. 62.)

**LEGAL STANDARDS**

Pursuant to Rule 55, courts follow a two-step process to enter default judgment. *City of New York v. Mickalis Pawn Shop, LLC*, 645

F.3d 114, 128 (2d Cir. 2011). First, once the defendant has been properly served with process but fails to plead or otherwise defend, and that failure is shown by affidavit or otherwise, the Clerk of Court enters the defendant's default. *See* Rule 55(a). The plaintiff may then move the court to enter a default judgment against the defendant. *See* Rule 55(b)(2). "Before entering a default judgment, the court must ensure that (1) jurisdictional requirements are satisfied, (2) the plaintiff took all required procedural steps in moving for a default judgment, and (3) the plaintiff's allegations establish the defendant's liability as a matter of law." *Wilmington Sav. Fund Soc'y, FSB as trustee of Aspen Holdings Tr. v. Fernandez*, 712 F. Supp. 3d 324, 330 (E.D.N.Y. 2024).

A "plaintiff is not entitled to a default judgment as a matter of right simply because a party is in default." *Finkel v. Universal Elec. Corp.*, 970 F. Supp. 2d 108, 118 (E.D.N.Y. 2013). Rather, the decision to grant a motion for default judgment is "left to the sound discretion of [the] district court because it is in the best position to assess the individual circumstances of a given case and to evaluate the credibility and good faith of the parties." *Enron Oil Corp. v. Diakuhara*, 10 F.3d 90, 95 (2d Cir. 1993)

In determining if the allegations establish the defendant's liability as a matter of law, the "court is required to accept all

of the . . . factual allegations as true and draw all reasonable inferences in [the plaintiff's] favor." *Finkel v. Romanowicz*, 577 F.3d 79, 84 (2d Cir. 2009). It is "the plaintiff's burden to demonstrate that those uncontroverted allegations, without more, establish the defendant's liability on each asserted cause of action." *Gunawan v. Sake Sushi Rest.*, 897 F. Supp. 2d 76, 83 (E.D.N.Y. 2012).

## DISCUSSION

The SEC moves for a final judgment (1) finding Dove liable for violations of the securities laws and regulations; (2) enjoining Dove from engaging in future violations of the securities laws and regulations; (3) imposing a penny stock bar against Dove; (4) ordering Shredderz to disgorge the net profits gained as a result of the alleged conduct and pay prejudgment interest; and (5) ordering Dove to disgorge the net profits gained as a result of the alleged conduct, pay prejudgment interest, and pay a civil penalty. (ECF Nos. 57, 60-62.) For the following reasons, the SEC's motion is GRANTED as to Dove but DENIED without prejudice as to Shredderz.

### I. Procedural Compliance

As part of its instant motions and in compliance with the Local Civil Rules of this District, the SEC included a memorandum of law (ECF Nos. 57-1); copies of the Clerk of Court's Certificates of Default (ECF Nos. 57-5, 57-7); a copy of the Complaint (ECF No.

57-3); proof of service of the summons and Complaint (ECF Nos. 57-4, 57-6); proposed final judgments (ECF Nos. 57-20, 60-2); and proof of mailing of the motions and associated papers to Dove and Shredderz at their last known addresses or e-mail addresses (ECF No. 57 at 2-3, 60 at 4, 61 ¶¶ 3-5, 62 at 2-3). The SEC also filed a supplemental declaration establishing that Dove is not in active military service. (*See* ECF No. 61 ¶ 2; ECF No. 61-1); *Jimenez v. Green Olive Inc.*, 744 F. Supp. 3d 221, 244 (E.D.N.Y. 2024)("obtain[ing] a report certifying active-duty military status through the SCRA website" is sufficient to satisfy the SCRA). Having determined that the SEC has adequately complied with the Local Civil Rules, the Court now considers the SEC's third motion for default judgment against Dove and Shredderz.

## II. Jurisdiction

A court "may not enter a default judgment unless it has both subject-matter jurisdiction over the action and personal jurisdiction over each defendant." *Guerra v. Steelstone Grp., LLC*, No. 22-CV-7191 (KAM) (SJB), 2024 WL 2319685, *3 (E.D.N.Y. May 22, 2024) (citing *Covington Indus., Inc. v. Resintex A. G.*, 629 F.2d 730, 732 (2d Cir. 1980)). The Court has subject matter jurisdiction over the instant action pursuant to Section 22(a) of the Securities Act [15 U.S.C. §77v(a)] and Sections 21(d), 21(e), and 27 of the Exchange Act [15 U.S.C. §§78u(d), 78u(e), and 78aa].

### A. Personal Jurisdiction Legal Standard

"[T]he Securities Exchange Act permits the exercise of personal jurisdiction to the limit of the Due Process Clause of the Fifth Amendment." *S.E.C. v. Unifund SAL*, 910 F.2d 1028, 1033 (2d Cir. 1990). The Due Process Clause of the Fifth Amendment "has two related components: the 'minimum contacts' inquiry and the 'reasonableness' inquiry." *Metro. Life Ins. Co. v. Robertson-Ceco Corp.*, 84 F.3d 560, 567 (2d Cir. 1996).

To demonstrate "minimum contacts" "[t]he Second Circuit has explained that a defendant's 'overall activity within the forum state' and the 'in-state effects of out-of-state activity' are [two] 'independent, if conceptually overlapping, methods of demonstrating minimum contacts.'" *Sec. & Exch. Comm'n v. PlexCorps*, No. 17-CV-7007 (CBA)(RML), 2018 WL 4299983, at *9 (E.D.N.Y. Aug. 9, 2018) (quoting *Best Van Lines, Inc. v. Walker*, 490 F.3d 239, 243 (2d Cir. 2007)). Under the first test, there is sufficient minimum contacts to establish personal jurisdiction if the "'in-forum activity sufficiently reflects the defendant's purposeful availment of the privilege of carrying on its activities.'" *Id.* (quoting *Licci ex rel. Licci v. Lebanese Can. Bank, SAL*, F.3d 161, 173 (2d Cir. 2013)). Under the second "effects test," "[c]ourts in this Circuit have upheld personal jurisdiction . . . when (1) a defendant's 'acts caused effects in the United States,' (2) the effects 'were the direct and foreseeable result of the actions abroad,' and (3) 'the defendant

knew or had good reason to know that the actions would have effects in the United States.'" *Id.* (quoting *SEC v. Dunn*, 587 F. Supp. 2d 486, 509 (S.D.N.Y. 2008)).

"Where the plaintiff alleges violations of the federal securities laws, the minimum-contacts test . . . looks to contacts with the entire United States rather than with the forum state." *Sec. & Exch. Comm'n v. Stubos*, 634 F. Supp. 3d 174, 186 (S.D.N.Y. 2022) (citation modified); *see also Adams v. Gharib*, No. 24-CV-9378 (LAK), 2026 WL 810313, at *1 (S.D.N.Y. Mar. 23, 2026) ("[T]he Second Circuit has consistently held that the minimum-contacts test [regarding Securities Act Violations] looks to contacts with the entire United States rather than with the forum state."); *In re Glob. Cord Blood Corp. Sec. Litig.*, 820 F. Supp. 3d 221, 240 (S.D.N.Y. 2026) ("Because the Exchange Act authorizes nationwide service of process, the relevant contacts for purposes of the 'minimum contacts' analysis are those with the United States as a whole.") The minimum contacts test is satisfied if the SEC alleges "facts . . . sufficient to demonstrate that [defendant] engaged in activity abroad that had a 'direct and unmistakably foreseeable effect within the United States.'" *Stubos*, 634 F. Supp. 3d at 187 (citation modified).

"When a court considers personal jurisdiction in the posture of a default judgment, although the plaintiffs retain the burden of proving personal jurisdiction, they can satisfy that burden

with a *prima facie* showing, and may rest their argument on their pleadings, bolstered by such affidavits and other written materials as they can otherwise obtain." *S.E.C. v. Aimsi Techs., Inc.*, 650 F. Supp. 2d 296, 301 (S.D.N.Y. 2009) (citation modified).

**B. Personal Jurisdiction Over Dove**

The SEC has pleaded sufficient facts to establish a basis for personal jurisdiction over Dove. The SEC alleges that Dove used "high pressure sales tactics" to fraudulently "sell the stocks of numerous small United States-based public companies to United States investors" on "foreign trading platforms whose primary business purpose was to facilitate illegal securities transactions in United States securities markets." (Compl. ¶¶ 1, 28.) The SEC thus alleged "facts . . . sufficient to demonstrate that [Dove] engaged in activity abroad that had a 'direct and unmistakably foreseeable effect within the United States.'" *Stubos*, 634 F. Supp. 3d at 187 (citation modified) (SEC sufficiently alleged personal jurisdiction over individual defendant who "induced U.S. investors to buy" shares of U.S. companies).

Furthermore, this "is not the rare case where the reasonableness analysis [under the Due Process Clause] defeats the exercise of personal jurisdiction" because of the "strong federal interests involved" in the SEC's claims "brought under the federal securities laws," which "are an area of strong federal concern that falls at the center of Congress' commerce power. *United*

*States Sec. & Exch. Comm'n v. Passos*, 760 F. Supp. 3d 95, 113 (S.D.N.Y. 2024) (citation modified).

**C. Personal Jurisdiction Over Shredderz**

The SEC, however, fails to plead sufficient facts demonstrating that Shredderz, a corporation incorporated in the Federation of Saint Kitts and Nevis, has sufficient minimum contacts with the United States to establish a basis for personal jurisdiction. (*See* Compl. ¶ 21.) The SEC alleges that the Control Groups "directly or indirectly, transferred the net amount of at least $1,645,000" to Shredderz that were "the proceeds of Defendants' illegal conduct." (Compl. ¶ 21.) The SEC also alleges that the Control Groups and three foreign trading platforms "transferred sums of money from trading proceeds in the stocks promoted by Defendants' boiler room to Shredderz." (Compl. ¶ 99.) The SEC allegations regarding Shredderz are scarce and generally involve transfers from the Foreign Platforms and Control Groups, whose domiciliaries are not alleged, to Shredderz, and transfers from Shredderz to the Defendants.[1] (*See* Compl. ¶¶ 13-17, 21, 99.)

---

[1] The SEC's allegations, at most, potentially include one alleged Shredderz contact with the United States. The SEC alleges that Shredderz transferred $72,000 to Chester Bruce Alvarez, who is alleged to be a United States citizen and resident of both Oakland Park, Florida and Medellin, Colombia. (Compl. ¶¶ 15, 96.) But the SEC alleges that Alvarez conducted the fraudulent scheme from the operation of a call center in Medellin, Colombia. (*See e.g.*, Compl. ¶ 1.) There is also no allegation that Shredderz transferred any funds to a bank account located in the United

The lack of facts alleged regarding Shredderz's involvement in the fraudulent scheme are distinguishable from cases in which courts have found sufficient minimum contacts to establish personal jurisdiction over foreign defendants. In such cases, the foreign defendants took some direct action in the United States that "purposely availed" themselves of the forum of the United States or directly participated in some action that furthered the fraudulent scheme directed at the United States. *See Sec. & Exch. Comm'n v. China Energy Sav. Tech., Inc.*, No. 06-CV-6402 (ADS) (AKT), 2007 WL 9711174, at *3 (E.D.N.Y. Mar. 19, 2007) (Relief Defendants were subject to personal jurisdiction because they "purposely availed" themselves of the forum of the United States and had an "unmistakably foreseeable effect in the United States" when they filed documents with the SEC for the purpose of enabling the sale of a United States corporation's stock as part of an alleged pump and dump scheme (citation modified)); *Sec. & Exch. Comm'n v. Terraform Labs Pte. Ltd.*, 684 F. Supp. 3d 170, 187-88 (S.D.N.Y. 2023) (Singaporean crypto-asset company had sufficient minimum contacts with the United States because SEC alleged Singaporean company's British Virgin Islands subsidiary was "mere department" of Singaporean parent and executed contracts to sell and lend crypto to companies in the United States); *S.E.C. v.*

---

States or that there was any other contact with the United States.

*Gonzalez de Castilla*, No. 01 CIV. 3999 (RWS), 2001 WL 940560, at *6 (S.D.N.Y. Aug. 20, 2001) (Foreign defendants who only held joint bank accounts in United States, through which other defendants engaged in insider trading, had sufficient minimum contacts with the United States through ownership of the joint brokerage account where SEC alleged and established prima facie case that the foreign defendants were themselves involved in insider trading)

By contrast, the SEC fails to allege that Shredderz took any action within the United States or knew that the transfers it conducted advanced the Defendants' fraudulent scheme targeting retail investors in the United States. The SEC fails to allege any facts demonstrating any contact between Shredderz and the United States or that Shredderz engaged in any activity in the United States that "purpose[ly] availed" itself of the United States for "the privilege of carrying on its activities." *Licci*, F.3d at 173. Nor does the SEC allege that Shredderz took any action abroad that Shredderz knew would "cause[] effects in the United States" that were a "direct and foreseeable result of [Shredderz's] actions abroad." *PlexCorps*, 2018 WL 4299983, at *9 (citation modified); *see also Sec. & Exch. Comm'n v. Gastauer*, 93 F.4th 1, 12 (1st Cir. 2024) (reversing district court's finding of personal jurisdiction over German father with no contacts with the United States who was only alleged to have received proceeds from

son's illegal scheme); *S.E.C. v. Alexander*, No. 00 CIV 7290 (LTS) (HBP), 2003 WL 21196852, at *3 (S.D.N.Y. May 20, 2003) (holding that SEC failed to allege "the requisite minimum contacts" with the United States to find personal jurisdiction over Greek citizen and resident where SEC failed to allege that she engaged in insider trading or traded securities at all, but only alleged that insider traded United States securities through account held in Greek citizen's name).

The SEC fails to cite any case law or offer any argument on how Shredderz, a foreign corporate defendant which appears to have no contacts with the United States, has sufficient United States contacts to establish a basis for personal jurisdiction.[2]

[2] The Complaint also alleges that Dove is the sole officer and director of Shredderz and that Shredderz was incorporated by Mr. Dove in June 2016. (Compl. ¶ 21.) But the SEC has failed to plead sufficient facts or advance any argument to establish any basis for personal jurisdiction over Shredderz as Dove's alter ego because it has failed to allege that Shredderz transacted no independent corporate business outside of Dove's personal interests. *See S.E.C. v. Montle*, 65 F. App'x 749, 753 (2d Cir. 2003) (affirming district court's legal conclusion that a British Virgin Islands corporation was an alter ego of an individual and holding that "inasmuch as personal jurisdiction exist[ed] over [the individual], jurisdiction over his alter ego [wa]s proper as well" where the undisputed facts in the record demonstrated that the British Virgin Islands corporation at issue exclusively transacted the business of the individual and was set up for the sole purpose of limiting the individual's liability); *Heitz v. Salant Corp.*, No. 95 CIV. 3866 (DC), 1997 WL 13241, at *4 (S.D.N.Y. Jan. 15, 1997) (allegations that individual was "sole and principal stockholder" in corporation was insufficient to establish alter ego liability); *United States v. Funds Held in the Name or for the Benefit of Wetterer*, 210 F.3d 96, 106–07 (2d Cir. 2000) ("Courts

Accordingly, the Court denies without prejudice the SEC's motions as to Shredderz for default judgment, disgorgement, and pre-judgment interest.

**III. Dove's Liability as to Violations of Securities Law**

Because the SEC has met the jurisdictional and procedural prerequisites for default judgment, the Court now must assess whether the SEC's "well-pleaded allegations in a complaint establishes ... defendant's liability." *Trans World Airlines, Inc. v. Hughes*, 449 F.2d 51, 69 (2d Cir. 1971), *rev'd on other grounds*, 409 U.S. 363 (1973). The SEC must "establish that on the law it is entitled to the relief it seeks, given the facts as established by the default." *Finkel v. Triple A Group, Inc.*, 708 F.Supp.2d 277, 280 (E.D.N.Y. 2010) (citation modified).

The Complaint alleges that Dove violated (i) Section 10(b) of the Securities Exchange Act of 1934, 15 U.S.C. § 78j(b) and Rule 10b-5, 17 C.F.R. § 40.10b-5, thereunder; and (ii) Section 17(a) of the Securities Act, 15 U.S.C. § 77q(a). (Compl. ¶¶ 100-105.)

To establish a civil claim under Section 10(b) of the Exchange Act and Rule 10b-5, the SEC must allege that "in connection with the purchase or sale of a security the defendant, acting with

---

must be extremely reluctant to disregard corporate form . . . and should do so only when the corporation primarily transacts the business of the dominating interest rather than its own." (citation modified))

scienter, made a material misrepresentation (or a material omission if the defendant had a duty to speak) or used a fraudulent device." *S.E.C. v. First Jersey Sec., Inc.*, 101 F.3d 1450, 1467 (2d Cir. 1996). A misrepresentation or omission is material if there is a "substantial likelihood that the disclosure of the omitted fact would have been viewed by the reasonable investor as having significantly altered the total mix of information made available." *Basic, Inc. v. Levinson*, 485 U.S. 224, 231-32 (1988). "[S]cienter requires proof that the defendant acted with 'a mental state embracing intent to deceive, manipulate, or defraud.'" *S.E.C. v. Penn*, 225 F. Supp. 3d 225, 236 (S.D.N.Y. 2016) (quoting *Ernst & Ernst v. Hochfelder*, 425 U.S. 185, 193 & n.12 (1976)).

Liability under Section 17(a) of the Securities Act is established with "essentially the same elements [as Section 10(b) and Rule 10b-5 of the Exchange Act] . . . in connection with the offer or sale of a security." *First Jersey Sec.*, 101 F.3d at 1467. Scienter, however, is not required to establish Section 17(a) liability. *See id.*

Here, the SEC has adequately alleged that Dove violated the Exchange Act Section 10(b), Rule 10b-5, and the Securities Act Section 17(a). First, the SEC alleged that Dove made various material misrepresentations in connection with the purchase or sale of securities. (*See e.g.*, Compl. ¶¶ 4, 67, 68, 76, 78, 79.) After a junior employee piqued interest in the boiler room's

purported financial advisory organization, Dove functioned as a "closer" in the boiler room who persuaded investors with false representations to purchase securities promoted by the boiler room. (*Id.* ¶¶ 31, 44, 48.) Dove also oversaw the operations of the boiler room and used fictitious companies to create an air of legitimacy with potential investors. (*Id.* ¶¶ 34-37.) The Court finds that Dove's misrepresentations are likely to have "significantly altered the 'total mix' of information" for a reasonable investor and are thus material. *Basic, Inc.*, 485 U.S. at 231-32.

Additionally, the SEC alleged that Dove "obtain[ed] money" from the Control Groups and Foreign Platforms through his fraudulent conduct. 15 U.S.C. § 77(q). As alleged in the Complaint, Dove received $1,803,543 and other items of value, including ski vacations and expensive watches from the Control Groups and Foreign Platforms for his participation in the fraudulent scheme. (Compl. ¶¶ 96, 97.)

Finally, the SEC alleged that Dove acted with scienter. (*See* Compl. ¶¶ 4, 34-37, 67, 68, 76, 78, 79.) The Court agrees and finds that Dove's scheme involved a high degree of scienter and was not isolated. As discussed above, Dove created false companies and personas, used them to lure in and mislead vulnerable investors, and then erased traces of those fraudulent personas before moving on to his next victims. (*See* Compl. ¶¶ 5, 8, 36-

49.) As a result of Dove's conduct, the boiler room promoted the stock of at least 18 issuers and sold at least $58 million in stock for the Control Groups. (*Id.* ¶ 3.) Accordingly, the Court finds that the SEC has alleged that Dove acted with scienter, and thus, violated Section 10(b) of the Exchange Act, Rule 10b-5, and Section 17(a) of the Securities Act.

**IV. Requested Relief**

**D. Permanent Injunction and Penny Stock Bar as to Dove**

The SEC requests that the Court permanently enjoin Dove from future securities law violations. (Mot. at 8-12.) "A permanent injunction is appropriate where there has been a violation of the federal securities laws and there is a reasonable likelihood of future violations." *S.E.C. v. Haligiannis*, 470 F. Supp. 2d 373, 383 (S.D.N.Y. 2007) (citing *SEC v. Commonwealth Chem. Sec., Inc.*, 574 F.2d 90, 99 (2d Cir. 1978)). To award permanent injunctive relief for violations of the federal securities laws, "a court must look beyond the mere facts of past violations and demonstrate a realistic likelihood of recurrence, but fraudulent past conduct gives rise to an inference of a reasonable expectation of continued violations." *S.E.C. v. Opulentica, LLC*, 479 F. Supp. 2d 319, 329 (S.D.N.Y. 2007). To determine if recurrence is likely, courts consider the following factors: (1) whether the defendant has been found liable for the illegal conduct; (2) the degree of scienter exhibited; (3) whether the violation was an isolated incident; (4)

whether the defendant continues to maintain that his past conduct was blameless; and (5) whether, by reason of his professional occupation, defendant might be in a position that may provide opportunity for further violations. *See S.E.C. v. Cavanaugh*, 155 F.3d 129, 135 (2d Cir. 1998).

Here, the SEC has adequately alleged that Dove's conduct satisfied the relevant *Cavanaugh* factors. As discussed above, the SEC's allegations, taken as true, reveal egregious misconduct. Dove was the ringleader of a multi-year and multifaceted fraudulent scheme, which defrauded innocent retail investors out of millions of dollars. (*See* Compl. ¶¶ 4-5, 8, 31, 33-49, 67, 68, 76, 78, 79.) Dove's behavior also did not arise from a single, isolated incident, but rather represented a continuing course of wrongful conduct over at least two years in which he deliberately attempted to conceal his tracks. (*See id.*) Dove has also failed to appear in this action and, thus, has failed to provide any assurances against future misconduct. *See Sec. & Exch. Comm'n v. Bronson*, 246 F. Supp. 3d 956, 975 (S.D.N.Y. 2017), *aff'd sub nom. United States Sec. & Exch. Comm'n v. Bronson*, 756 F. App'x 38 (2d Cir. 2018), *as amended* (Nov. 20, 2018) ("[P]ersistent refusals to admit any wrongdoing make it rather dubious that the offenders are likely to avoid such violations of the securities laws in the future in the absence of an injunction." (citation modified)).

For the same reasons as those justifying a permanent

injunction from future violations of securities law, the Court similarly finds that the imposition of a permanent penny stock ban against Dove is also appropriate. (*See* Mot. at 19-20.) Section 20(g) of the Securities Act and Section 21(d)(6) of the Exchange Act provide courts with the authority to bar any person from participating in an offering of penny stock if that person was participating in the offering of a penny stock at the time of misconduct. *See* 15 U.S.C. §§ 77t(g); 78u(d)(6). A "person participating in an offering of penny stock" includes "any person engaging in activities with a broker, dealer, or issuer for purposes of issuing, trading, or inducing or attempting to induce the purchase or sale of, any penny stock." 15 U.S.C. §§ 77t(g)(2); 78u(d)(6)(B). A "penny stock" is defined in Section 3(a)(51) of the Exchange Act and in Rule 3a51-1 thereunder as equity securities that trade below $5 a share and do not meet certain thresholds of tangible assets or revenue. *See* 15 U.S.C. § 78c(a)(51).

Taking the allegations in the Complaint as true, Dove's boiler room and scheme promoted penny stocks that traded below $5 a share and interacted with issuers. (*See* Compl. ¶¶ 59, 70, 81, 90, 96.) Moreover, "the repeat nature of [Dove's] violations," over a period of two years, "as well as the lack of acknowledgment of wrongdoing, weigh in favor of ordering such relief." *Bronson*, 246 F. Supp. 3d at 975. Accordingly, the SEC's request to permanently enjoin Dove from future violations of the securities laws and impose a

permanent penny stock ban against Dove is granted.

**E. Disgorgement Award as to Dove**

The SEC seeks the disgorgement of ill-gotten gains from Dove pursuant to Section 21(d)(7) of the Exchange Act, 15 U.S.C. § 78u(d)(7). (Compl. ¶ 34.) Disgorgement of illicit profits is a proper equitable remedy for securities fraud. *See S.E.C. v. Tome*, 833 F.2d 1086, 1096 (2d Cir. 1987) ("[Disgorgement] 'is a method of forcing a defendant to give up the amount by which he was unjustly enriched." (citation modified)). "A district court has 'broad discretion not only in determining whether or not to order disgorgement but also in calculating the amount to be disgorged.'" *S.E.C. v. Svoboda*, 409 F. Supp. 2d 331, 344 (S.D.N.Y. 2006) (quoting *First Jersey Securities, Inc.*, 101 F.3d at 1474-75). "The primary purpose of disgorgement orders is to deter violations of the securities laws by depriving violators of their ill-gotten gains." *S.E.C. v. Fischbach Corp.*, 133 F.3d 170, 175 (2d Cir. 1997). The SEC may seek disgorgement under Section 21(d)(7) of the Exchange Act, 15 U.S.C. § 78u(d)(7) for violations of Section 10(b) of the Securities Exchange Act of 1934, 15 U.S.C. § 78j(b), and Section 17(a) of the Securities Act, 15 U.S.C. § 77q(a), for violations up to ten years prior to the Government's filing of the complaint. 15 U.S.C. § 78u(d)(8)(A)(ii)(I),(II).

Because the distribution of disgorged profits to fraud victims is a secondary goal, "the size of a disgorgement order

'need not be tied to the losses suffered by defrauded investors.'" *Official Comm. Of Unsecured Creditors of WorldCom, Inc. v. S.E.C.*, 467 F.3d 73, 81 (2d Cir. 2006) (quoting *Fischbach Corp.*, 133 F.3d at 175-76). "The principal issue, therefore, in determining the amount of disgorgement to be ordered is the amount of gain received by each defendant from the fraud." *S.E.C. v. Inorganic Recycling Corp.*, No. 99-cv-10159 (GEL), 2002 WL 1968341, at *2 (S.D.N.Y. Aug. 23, 2002). "[B]ecause of the difficulty of determining with certainty the extent to which a defendant's gains resulted from his frauds—especially profits from transactions in securities whose market price has been affected by the frauds—the court need not determine the amount of such gains with exactitude;" instead, "'[t]he amount of disgorgement ordered need only be a reasonable approximation of profits causally connected to the violation.'" *S.E.C. v. Razmilovic*, 738 F.3d 14, 31 (2d Cir. 2013), *as amended* (Nov. 26, 2013) (quoting *First Jersey Securities, Inc.*, 101 F.3d at 1475) (citation modified). "Given these difficulties, '[s]o long as the measure of disgorgement is reasonable, any risk of uncertainty should fall on the wrongdoer whose illegal conduct created that uncertainty.'" *Id.* (quoting *SEC v. Warde*, 151 F.3d 42, 50 (2d Cir. 1998) (citation modified).

In support of the SEC's request of $1,803,543 in disgorgement from Dove, the SEC submitted a declaration from Ryan Murphy, (ECF No. 57-8, "Murphy Decl.") an Enforcement Accountant for the

Securities and Exchange Commission, and four accompanying exhibits of bank records. (*See* ECF Nos. 57-9, 57-10, 57-11, 57-12; Compl. ¶ 96.) To calculate the net proceeds that Dove received from the violations here, Mr. Murphy attests that he reviewed bank and trading records maintained by Wintercap, one of the fraudulent trading platforms used by the Defendants' control group clients (Compl. ¶¶ 28, 97, 99), and bank account records of Michael Black, ("Black"), who is named as "Person A" in the Complaint and one of the Defendants' partners in the pump and dump deals here, (Compl. ¶¶ 33-38, 42). (Murphy Decl. ¶¶ 9, 10.) Mr. Murphy further attests that the payments to Dove from these sources are likely the proceeds of the trading of shares in Dove's scheme. (*Id.* at 13.) Mr. Murphy attests to a table listing and summing the payments Dove received into his personal accounts from Wintercap or Mr. Black from January 6, 2016 to March 5, 2019 for a total of $1,803,543. (*Id.* ¶¶ 11, 13.) Mr. Murphy also compiled the underlying bank account records in attached exhibits. (*See* ECF Nos. 57-9, 57-10, 57-11, 57-12.) Mr. Murphy notes that this sum likely undercounts Dove's ill-gotten gains because it does not account for in-kind gifts received from Wintercap and others. (Murphy Decl. ¶ 13.)

Based on the Murphy Declaration and the bank account statements, the Court finds that Dove is liable for a disgorgement amount of $1,803,543. Because the Court finds the SEC has not

alleged facts sufficient to establish personal jurisdiction over Shredderz, the Court does not reach Shredderz request for joint and several liability.

**F. Pre-Judgment Interest**

The Court also finds that the imposition of prejudgment interest is appropriate. "[D]isgorgement and prejudgment interest flow from the principle that, as between one who has broken the law and the authorities charged with enforcing it, the lawbreaker should not be able to retain the fruits of the violation." *SEC v. Elliott*, No. 09-CV-7594, 2011 WL 3586454, at *12 (S.D.N.Y. Aug. 11, 2011). "Requiring payment of interest prevents a defendant from obtaining the benefit of what amounts to an interest free loan procured as a result of illegal activity." *Id.* (citation modified). As the SEC proposes here, "[t]he interest rate generally used to calculate disgorgement interest is the IRS's underpayment rate." *Bronson*, 246 F. Supp. 3d at 976 (citation modified); *see also First Jersey Sec., Inc.*, 101 F.3d at 1476 (holding same); 17 C.F.R. §201.600(b) (Commission Rules of Practice stating that prejudgment interest is computed at IRS underpayment rate, compounded quarterly).

The SEC calculated $1,119,903 prejudgment interest as to Dove in accordance with the IRS underpayment rate for Dove's ill-gotten gains, assuming Dove received such gains on the last day of the year in which they were paid with an ending date of August 31,

2026. (*See* ECF No. 62 at 1-2, Ex. B; Murphy Decl. ¶¶ 18-21.) Accordingly, the Court finds that an award of $1,119,903 prejudgment interest as to Dove is warranted.

**G. Civil Penalties as to Dove**

The SEC seeks a "third-tier civil penalty on Dove" totaling $1,655,157 and calculated as "one third-tier penalty of $236,451, multiplied by seven violations" for "each of the seven issuers that [Dove's] boiler room promoted in the five years before" the Complaint was filed in this case. (Mot. Suppl. at 2-3; *see also* ECF No. 60-1, "Murphy Supp. Decl." ¶¶ 7,8.)

"Section 20(d) of the Securities Act permits a court to impose civil penalties on a defendant who has violated the Act." *Bronson*, 246 F. Supp. 3d at 977 (citing 15 U.S.C. § 77t(d)); *see also Razmilovic*, 738 F.3d at 36 ("[T]he [Securities Act of 1933 and 1934] give[s] the court discretion to order a defendant who has violated those statutes to pay civil penalties."). Civil penalties are designed to punish the individual violator and deter future violations of the securities laws. *S.E.C. v. Moran*, 944 F. Supp. 286, 296 (S.D.N.Y. 1996); *see also S.E.C. v. Universal Exp., Inc.*, 646 F. Supp. 2d 552, 567 (S.D.N.Y. 2009), *aff'd,* 438 F. App'x 23 (2d Cir. 2011) (Disgorgement "merely restores [the] defendant to his original position without extracting a real penalty for his illegal behavior, . . . the imposition of civil penalties is appropriate to accomplish the goal of punishment" (citation

modified)).

There are three "tiers" of civil penalties each carrying a maximum penalty and requirements. 15 U.S.C. § 78u(d)(3). A third-tier penalty carries a maximum $100,000 penalty for each violation "if the violation . . . involved fraud, deceit, manipulation, or deliberate or reckless disregard of a regulatory requirement; and . . . such violation directly or indirectly resulted in substantial losses or created a significant risk of substantial losses to other persons." § 78u(d)(3)(B)(iii)(aa),(bb). Adjusted for inflation, each third-tier penalty violation occurring after November 3, 2015 for a natural person is $236,451 per violation. Inflation Adjustments to the Civil Monetary Penalties Administered by the Securities and Exchange Commission (as of January 15, 2025), at 2available at https://www.sec.gov/files/civil-penalties-inflation-adjustments_1_0.pdf.

In determining whether civil penalties should be imposed, and the amount of the penalty, courts look to a number of factors, including (1) the egregiousness of the defendant's conduct; (2) the degree of the defendant's scienter; (3) whether the defendant's conduct created substantial losses or the risk of substantial losses to other persons; (4) whether the defendant's conduct was isolated or recurrent; and (5) whether the penalty should be reduced due to the defendant's demonstrated current and future financial condition. *See S.E.C. v. Coates*, 137 F. Supp. 2d 413,

428–29 (S.D.N.Y. 2001) (listing factors); *S.E.C. v. Credit Bancorp, Ltd.*, No. 99-cv-11395 (RWS), 2002 WL 31422602 (S.D.N.Y. Oct. 29, 2002). Although these factors are helpful in characterizing a particular defendant's actions, the civil penalty framework is of a "discretionary nature" and each case "has its own particular facts and circumstances which determine the appropriate penalty to be imposed." *Moran*, 944 F. Supp. at 296–97.

Here, taking the allegations in the Complaint as true, Dove's violations of the securities laws plainly support the imposition of a third-tier penalty. Dove played a principal role in a fraudulent scheme that deprived vulnerable retail investors of millions of dollars. (*See* Compl. ¶¶ 4-5, 8, 31, 33-49, 67, 68, 76, 78, 79.) Dove's conduct was also recurrent, involving multiple repetitive violations and deliberate attempts to conceal his tracks. (*See id.*) These facts alone warrant imposition of a third-tier penalty, as Dove's violations of securities laws involved fraud and resulted in substantial losses. In light of the seriousness of the fraud, the significant role played by Dove, and the extent of the benefits he received from the violations of the securities laws, a third-tier civil penalty is appropriate.

The Court must next consider the method by which the penalties should be calculated. As noted, the securities laws provide that the Court may impose a penalty of either the maximum pecuniary

gain for each defendant or the statutory maximum penalty as adjusted for inflation, whichever is greater. 15 U.S.C. §§ 77t(d), 78u(d)(3), 80b-9(3). The statutes, however, do not define the term "violation." *See id.* Courts in this circuit have adopted a range of approaches in determining what constitutes a "violation" of the securities laws. For example, some courts have looked to the numbers of investors defrauded or the total number of fraudulent transactions, while others have considered "the numbers of statutes that each defendant violated, or whether the violations were all part of a single scheme. *See, e.g.*, *S.E.C. v. Pentagon Cap. Mgmt. PLC*, 725 F.3d 279, 287 n.7 (2d Cir. 2013)(approving district court's methodology of counting each trade as a separate violation); *S.E.C. v. Glantz*, No. 94-cv-5737 (LAP), 2009 WL 3335340, at *6 (S.D.N.Y. Oct. 13, 2009) (assessing one violation for each victim); *S.E.C. v. Shehyn*, No. 4-cv-2003 (LAP), 2010 WL 3290977, at *8 (S.D.N.Y. Aug. 9, 2010) (assessing penalty for each statute violated); *S.E.C. v. Rabinovich & Assocs., LP*, No. 7-cv-10547 (GEL), 2008 WL 4937360, at *6 (S.D.N.Y. Nov. 18, 2008) (finding one violation where defendant's conduct was part of "single scheme or plan")).

The Court finds the SEC's proposed calculation of "one third-tier penalty of $236,451, multiplied by seven violations" for "each of the seven issuers that [Dove's] boiler room promoted in the five years before" the Complaint was filed in this case, for a

total civil penalty of $1,655,157, is warranted and reasonable because it is less than Dove's calculated pecuniary gain of $1,803,543. *See Aimsi*, 650 F. Supp. 2d at 308 (imposing penalty equal to defendant's pecuniary gain in "pump and dump" scheme); (Mot. Suppl. at 2-3; Murphy Supp. Decl. ¶¶ 7,8.)

Accordingly, the SEC's request for a civil penalty is granted in the amount of $1,655,157.

**CONCLUSION**

For the foregoing reasons, the SEC's motion for default judgment is **GRANTED as to DOVE** but **DENIED without prejudice as to Shredderz.** The Court finds that Dove has committed violations of (i) Section 10(b) of the Securities Exchange Act of 1934, 15 U.S.C. § 78j(b) and Rule 10b-5, 17 C.F.R. § 40.10b-5, thereunder; and (ii) Section 17(a) of the Securities Act, 15 U.S.C. § 77q(a). Accordingly, the SEC's request for permanent injunctive relief and a penny stock ban against Dove is **GRANTED.** The Court further **GRANTS** the SEC's request for a civil remedy of $1,803,543 in disgorgement, $1,119,903 in pre-judgment interest, $1,655,157 in civil penalties, and post-judgment interest pursuant to 28 U.S.C. § 1961 against Dove. The Clerk of Court is respectfully to enter final judgment as to Dove.

The Court **DENIES without prejudice** the SEC's request for disgorgement and prejudgment interest against Shredderz. By October 7, 2026, the SEC will inform the Court of how it plans to

proceed with regard to Shredderz. If the SEC fails to do so by October 7, 2026, the Clerk of Court is respectfully directed to close this case on October 13, 2026.

**So ordered.**

Dated: September 30, 2026
Brooklyn, New York

**Kiyo A. Matsumoto**
United States District Judge
Eastern District of New York